UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

JANET L. SULLIVAN, Individually and on
Behalf of All Others Similarly Situated,

                         Plaintiff,

    vs.

ARCONIC INC., KLAUS KLEINFELD,
ROBERT S. COLLINS, WILLIAM F.
OPLINGER, ARTHUR D. COLLINS, JR.,
KATHRYN S. FULLER, JUDITH M.
GUERON, MICHAEL G. MORRIS, E.
STANLEY O'NEAL, JAMES W. OWENS,
PATRICIA F. RUSSO, SIR MARTIN
SORRELL, RATAN N. TATA, ERNESTO
ZEDILLO, MORGAN STANLEY & CO.
LLC, CREDIT SUISSE SECURITIES (USA)
LLC, CITIGROUP GLOBAL MARKETS
INC., GOLDMAN, SACHS & CO., J.P.
MORGAN SECURITIES LLC, BNP
PARIBAS SECURITIES CORP.,
MITSUBISHI UFJ SECURITIES (USA),
INC., RBC CAPITAL MARKETS, LLC and
RBS SECURITIES INC.,

                         Defendants.

——————————————————— x

Civil Action No.

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff Janet L. Sullivan ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Arconic, Inc. (formerly known as Alcoa, Inc.) (referred to herein as "Arconic" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Arconic Depositary Shares, each representing a 1/10th interest in a share of 5.375% Class B Mandatory Convertible Preferred Stock, Series 1, par value $1 per share, liquidation preference $500 per share (the "Preferred Shares") pursuant and/or traceable to the Registration Statement and Prospectus issued in connection with Arconic's September 18, 2014 initial public stock offering (the "Preferred IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].  This Court has jurisdiction of this action pursuant to §22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

3.      Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District and Arconic is headquartered in this District.

4.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

5.      Plaintiff Janet L. Sullivan purchased Arconic Preferred Shares pursuant and/or traceable to the Preferred IPO, and was damaged thereby.

6.      Defendant Arconic is a New York City-based American industrial supplier.  Prior to November 1, 2016, when the Company spun-off its mining and manufacture of raw aluminum operations to the new "Alcoa Corporation" (the "Spin-Off"), Arconic was known as Alcoa Inc. In connection with the Spin-Off, the Company also changed its name to Arconic.  Arconic remains engaged in the engineering and manufacturing of aluminum and other lightweight metals into products used worldwide in the aerospace, automotive, commercial transportation, packaging, building and construction, oil and gas, defense, consumer electronics, and industrial industries.  Following the Preferred IPO, and until the time of the Spin-Off, the Arconic Preferred Shares traded on the NYSE under the ticker symbol "AA-PRB" and have traded on the NYSE under the ticker symbol "ARNC-PB" since the time of the Spin-Off.

7.      Defendant Klaus Kleinfeld ("Kleinfeld") was at the time of the Preferred IPO and he remained, until his resignation in April 2017, the Chairman of Arconic's Board of Directors and its Chief Executive Office ("CEO").

8.      Defendant William F. Oplinger was, at the time of the Preferred IPO, the Executive Vice President and Chief Financial Officer of Arconic.  He has worked at Alcoa since the Spin-off.

9. Defendant Robert S. Collins was, at the time of the Preferred IPO, the Vice President and Controller of Arconic. He has worked at Alcoa since the Spin-off.

10. Defendants Arthur D. Collins, Jr. ("Collins"), Kathryn S. Fuller, Judith M. Gueron, Michael G. Morris, E. Stanley O'Neal ("O'Neal"), James W. Owens, Patricia F. Russo ("Russo"), Sir Martin Sorrell, Ratan N. Tata and Ernesto Zedillo were, at the time of the Preferred IPO, directors of Arconic. Defendants Collins, O'Neal and Russo remain directors of Arconic.

11. The defendants named in ¶¶7-10 are referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement.

12. Defendants Morgan Stanley & Co. LLC, Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., Goldman, Sachs & Co., J.P. Morgan Securities LLC, BNP Paribas Securities Corp., Mitsubishi UFJ Securities (USA), Inc., RBC Capital Markets, LLC and RBS Securities Inc., are investment banking firms that acted as underwriters of Arconic's Preferred IPO, helping to draft and disseminate the offering documents (the "Underwriter Defendants"). Underwriter Defendants Morgan Stanley & Co. LLC and Credit Suisse Securities (USA) LLC were both joint book-running managers for the Preferred IPO and representatives of the Underwriter Defendants in the Preferred IPO, and Underwriter Defendants Citigroup Global Markets Inc., Goldman, Sachs & Co., and J.P. Morgan Securities LLC were book-running managers for the Preferred IPO. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the Preferred IPO and shared $37.5 million in fees collectively. The Underwriter

Defendants determined that in return for their share of the Preferred IPO proceeds, they were willing to merchandize Arconic stock in the Preferred IPO;

(b)　　The Underwriter Defendants also demanded and obtained an agreement from Arconic that Arconic would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws.  They also made certain that Arconic had purchased millions of dollars in directors' and officers' liability insurance;

(c)　　Representatives of the Underwriter Defendants also assisted Arconic and the Individual Defendants in planning the Preferred IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Arconic, an undertaking known as a "due diligence" investigation.  The due diligence investigation was required of the Underwriter Defendants in order to engage in the Preferred IPO.  During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Arconic's operations and financial prospects;

(d)　　In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Arconic's lawyers, management and top executives and engaged in "drafting sessions" between at least July 2014 and September 2014.  During these sessions, understandings were reached as to: (i) the strategy to best accomplish the Preferred IPO; (ii) the terms of the Preferred IPO, including the price at which Arconic Preferred Shares would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Arconic would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Arconic management and top executives, the

Underwriter Defendants knew, or should have known, of Arconic's existing problems as detailed herein; and

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiff and the Class.

**SUBSTANTIVE ALLEGATIONS**

**The Spin-Off Transaction**

13.     Founded in 1886, the Company's predecessor, Alcoa, Inc., was the world's fifth largest producer of aluminum.  On November 1, 2016, Arconic spun-off its alumina and primary metals segments, the rolling mill at the Warrick, Indiana, operations and a 25.1% stake in the Ma'aden Rolling Company in Saudi Arabia into a new separately-held company, Alcoa Corporation.  The predecessor company also changed its name to Arconic and all references in this Complaint to Arconic include its predecessor company.  Post Spin-Off, Arconic has continued engaging in the Company's lightweight metals engineering and manufacturing operations.

14.     Arconic's multi-material products, which include aluminum, titanium, and nickel, are used worldwide in aerospace, automotive, commercial transportation, packaging, building and construction, oil and gas, defense, consumer electronics, and industrial applications. Arconic operates in 19 countries.

**The Reynobond Panels**

15.     Reynobond Aluminum Composite Material ("ACM") is a wall cladding product Arconic sells consisting of two sheets of thin aluminum, each permanently bonded to an extruded thermoplastic core.  The Reynobond ACM panels are combined with insulation to form cladding used to cover residential and office towers and other buildings.  One of the Company's

top selling products, Arconic has boasted in its "Reynobound Architecture – General Information Fabrication Guidelines" (published in 2010) that "***Reynobond is a fully tested product, with building-code approvals throughout the world***." [1]

16.     Reynobond panels are sold with either a Polyethylene ("PE") core, which is combustible, or a more expensive Fire Resistant ("FR") core.  The Polyethylene core product, Reynobond PE, the cheaper of the two products, was the one Arconic's sales personnel marketed and sold particularly when engaged in competitive bidding.

17.     Indeed, despite the known flammability of the Reynobond PE panels, resulting in prohibitions against installing them in high-rises in the U.S. and Europe, Arconic sold millions of dollars of the flammable panels for use in projects Arconic knew were inappropriate and presented a fire hazard.  Indeed, Arconic made sales of $711 million in the U.K. during 2016, $698 during 2015, $464 million during 2014, $475 million in 2013 and $438 million in 2012. During that same five year period, Arconic's total sales of "Architectural aluminum systems," which includes Reynobond panels, worldwide only amounted to $1,010 during 2016, $951 during 2015, $1,002, during 2014, $702 during 2013 and $692, meaning that a lot of the Reynobond PE systems being sold were being sold in the U.K.

### THE MATERIALLY FALSE AND MISLEADING
### REGISTRATION STATEMENT

18.     On or about July 11, 2014, Arconic filed with the SEC a Registration Statement on Form S-3, which would later be utilized for the Preferred IPO following an amendment made to it on July 25, 2014.  The Registration Statement was filed pursuant to SEC Rule 415 permitting the Company to sell up to $5 billion of any combination of its securities (including debt securities, Class B Serial Preferred Stock, Depository Shares, Common Stock, Warrants,

---

[1]     All emphasis is added unless otherwise noted.

Stock Purchase Contracts or Stock Purchase Units), in yet unspecified amounts, on yet undetermined dates. The Registration Statement expressly incorporated by reference certain past and future filings the Company made with the SEC, stating, in pertinent part, as follows:

**Incorporation by Reference**

The rules of the SEC allow us to incorporate by reference in this prospectus the information in other documents that we file with it, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be a part of this prospectus, and certain information in documents that we file later with the SEC will automatically update and supersede information contained in documents filed earlier with the SEC or contained in this prospectus. We incorporate by reference in this prospectus the documents listed below and any future filings that we may make with the SEC under Sections 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), on or after the date of this prospectus and before the termination of the offering . . . . :

- Our Annual Report on Form 10-K for the year ended December 31, 2013;

- Our Quarterly Reports on Form 10-Q for the quarters ended March 31, 2014 and June 30, 2014; and

- Our Current Reports on Form 8-K filed January 10, 2014 (Item 1.01 and Exhibit 99.1 of Item 9.01), January 21, 2014, January 23, 2014, February 21, 2014, March 18, 2014, April 14, 2014 (Item 8.01), May 8, 2014 (Item 5.07) and June 27, 2014 (Items 1.01 and 3.02 and Exhibits 2.1, 10.1 and 10.2 of Item 9.01).

19.    On July 30, 2014, the SEC declared the Registration Statement effective. On or about September 18, 2014, Arconic and the Underwriter Defendants priced the Preferred IPO and filed the final Prospectus for the Preferred IPO, which forms part of the Registration Statement (collectively, the "Registration Statement").

20.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

21.     Concerning sales in Arconic's "Engineered Products and Solutions" segment, which included sale of "integrated aluminum structural systems," the Registration Statement stated that "[t]hird-party sales for the Engineered Products and Solutions segment improved 4% in 2013 compared with 2012 . . . ."  The Registration Statement also stated in pertinent part that "[i]n 2014, . . . the building and construction end market [was] expected to improve as the gradual recovery in North America continue[d] and the decline in Europe slow[ed] down."

22.     Concerning the Company's compliance with applicable laws and safety standards, and the potential civil, regulatory and criminal risks the Company then faced, the Registration Statement expressly stated that Arconic then "believe[d] it ha[d] adopted appropriate risk management and compliance programs to address and reduce" its exposure to "a variety of legal compliance risks," "includ[ing], among other things, potential claims relating to product liability, health and safety, environmental matters . . . . "

23.     The statements referenced above in ¶¶ 18, 21, 22 were inaccurate statements of material fact because they failed to disclose the following material facts which existed at the time of the Preferred IPO:

(a)     that Arconic was knowingly selling Reynobond PE for use in construction projects where the product was to be used in a manner that the Company knew was unsafe and presented a fire hazard;

(b)     that Arconic's marketing and sales of highly-flammable Reynobond PE sales for use in high-rise tower projects across the U.K. and other countries directly conflicted with the purported strong culture of safety, ethics and legal compliance that the Company claimed to have and exposed Arconic to hundreds of millions of dollars in potential civil and criminal liability and reputational harm;

(c)      that Arconic's strong assurances of effective global safety and integrity practices concealed from investors the immense risk Arconic had assumed through its sales and marketing practices; and

(d)      as a result, Defendants' statements about Arconic's business, operations and financial prospects were materially false and misleading and/or lacked a reasonable basis.

24.      Under the rules and regulations governing the preparation of the Registration Statement, Arconic was required to disclose at the time of the Preferred IPO that it had been obtaining millions of dollars in revenues and profits as a result of its illicit sales tactics and that as a result the Company was potentially exposed to immense civil, regulatory and criminal liability.  The Registration Statement, however, contained no such disclosures.  Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, including any known trends, issuers are required to disclose events or uncertainties that have had or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  At the time of the Preferred IPO, Arconic had been knowingly selling its Reynobond PE panels for use on high-rise residential towers in the U.K. and other countries and knew that the product was being used in an inappropriate manner which potentially exposed the Company to significant civil, regulatory and/or criminal liability.  The uncertainty associated with these sales practices were reasonably likely to have a material impact on Arconic's profitability, and, therefore, were required to be disclosed in the Registration Statement but were not.

25.      The Preferred IPO was successful for the Company and the Underwriter Defendants, who sold 25 million Arconic Depositary Shares, each representing a 1/10th Interest in a Share of 5.375% Class B Mandatory Convertible Preferred Stock, Series 1, to the public at

$50 per share, raising $1.25 billion in gross proceeds for the Company ($1.2125 billion in net proceeds from the Preferred IPO after deducting underwriting discounts, commissions and offering costs).

### THE GRENFELL TOWER FIRE

26.     The Grenfell Tower is a 24-story, 220-foot (67 meter) high tower block of public housing flats in North Kensington, west London.  The Grenfell Tower was managed on behalf of the borough council by Kensington and Chelsea Tenant Management Organisation ("KCTMO"), the largest tenant management organisation ("TMO") in England, which is responsible for the management of nearly 10,000 properties in the borough.  The KCTMO has a board comprising of eight residents (tenants or leaseholders), four council-appointed members, and three independent members.

27.     The Grenfell Tower underwent a major renovation, completed in 2016.  Plans for the renovation were publicized in 2012.  The £8.7 million renovation was overseen by Studio E Architects, Rydon Ltd, of Forest Row, East Sussex, in conjunction with Artelia for contract administration and Max Fordham as specialist mechanical and electrical consultants.  As part of the project, in 2015–2016, the concrete structure received new windows and new aluminum composite rainscreen cladding supplied by Arconic, in part to improve the appearance of the building.  Two types were used: Arconic's Reynobond and Reynolux aluminum sheets.  Beneath these, and fixed to the outside of the walls of the flats, was Celotex RS5000 PIR thermal insulation.  Arconic sold its ACM panels to Worcester-based Omnis Exteriors, which acted as the "fabricator," cutting the panels into shape and supplying them to the contractors working on Grenfell.  The cladding installation work was carried out by Harley Facades of Crowborough, East Sussex, at a cost of £2.6 million.

28.    The original contractor, Leadbitter, had been dropped by KCTMO because their price of £11.278 million was £1.6 million higher than the proposed budget for the refurbishment. The contract was put out to competitive bidding.  Rydon's bid was £2.5 million less than Leadbitter's.  Rydon's bid called for the installation of Reynobond PE rather than Reynobond FR, despite that Grenfell Tower is 67 meters tall and Arconic's own marketing literature states it should not be used on buildings higher than 10 meters, due to its lack of fire retardant.

29.    On the evening of June 13, 2017, Arconic Preferred Shares closed at $42.66 each.

30.    On June 14, 2017, a fire engulfed Grenfell Tower.  The Grenfell Tower fire resulted in at least 79 fatalities and over 70 injuries.  The tower contained 127 flats, with 227 bedrooms, at the time of the fire.  The fire started in a fourth-floor flat.  The speed at which the fire spread is believed to have been increased by the building's exterior cladding, which had been provided by Arconic.  Flames consumed the tower quickly.  People trapped on the higher floors screamed for their lives through broken windows.  Flames in an ordinary fire burst out of windows, moving from the inside out.  Grenfell Tower burned in reverse, moving inward from the building's exterior.  The flames quickly tore upward in streaks through the facade, filling apartments with toxic black smoke.  Torrents of orange and red branched out of the first streaks and shot upward.  The flames encased the building in a cylinder of fire.  More than 200 firefighters battled the blaze. They brought 40 fire engines and other vehicles.

31.    On Saturday, June 24, 2017, *Reuters* published a report entitled "Arconic knowingly supplied flammable panels for use in tower – emails."  In its report, *Reuters* reported that Arconic employees knew Reynobond PE panels were being used on the more than 60 meter building, despite the warnings in its own sales brochures that such use was inappropriate and a fire hazard.  It also reported that Arconic's own personnel, dating back to 2014, were questioning

the use of the cheaper but more dangerous product on the Grenfell Tower refurbishment project.

The report stated, in pertinent part, as follows:

> Six emails sent by and to an Arconic Inc. [] sales manager raise questions about why the company supplied combustible cladding to a distributor for use at Grenfell Tower, despite publicly warning such panels were a fire risk for tall buildings.
>
> The emails, dating from 2014 and seen by Reuters, were between Deborah French, Arconic's UK sales manager, and executives at the contractors involved in the bidding process for the refurbishment contract at Grenfell Tower in London, where 79 people died in a blaze last week.
>
> When asked about the emails, Arconic said in a statement that it had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations.
>
> The company manufactures three main types of Reynobond panel – one with a polyethylene (PE) core, one with a fire retardant core and another with a non-combustible core, according to its website.
>
> Diagrams in a 2016 Arconic brochure for its Reynobond panels describe how PE core panels are suitable up to 10 meters in height.  Panels with a fire resistant core – the FR model – can be used up to 30 meters, while above that height, panels with the non-combustible core – the A2 model – should be used, the brochure says.
>
> Grenfell Tower is more than 60 meters tall.
>
> The brochure also issued a blunt warning that cladding can be a fire risk.
>
> "When conceiving a building, it is crucial to choose the adapted products in order to avoid the fire to spread to the whole building.  Especially when it comes to facades and roofs, the fire can spread extremely rapidly," the brochure said.
>
> "As soon as the building is higher than the fire fighters' ladders, it has to be conceived with an incombustible material."  ***Nonetheless, between May and July 2014, French, who was based at Arconic's factory in Merxheim, France, responded to requests from the companies involved in refurbishing Grenfell Tower on the availability of samples of five different types of Reynobond aluminium-covered panels, all of which were only available in the combustible PE and FR versions, according to Arconic brochures***.
>
> ***In the end, Arconic said on Friday, the company provided PE panels***.

32.    The *Reuters* report provided additional detail suggesting that Arconic had to have known of the building's height, and thus the risk, and was directly involved in the sale of the product for use in the project.  The report stated, in pertinent part, as follows:

> Arconic, which was known as Alcoa Inc until 2016, declined to say if it knew how tall the tower was and the emails seen by Reuters do not specifically refer to its height.  ***They do, however, refer to "Grenfell Tower" and mention other high rise projects where panelling has been used when discussing the appearance that was being sought for Grenfell Tower***.
>
> ***Arconic also knew the quantity of panels being supplied and thus the total exterior coverage.  A source at one of the companies involved in the process said Arconic had "full involvement" throughout the contract bidding process***.
>
> \*    \*    \*
>
> ***In the emails, French and representatives of Harley and Rydon also discuss the choice of panel models and colors and how they were inching towards securing the contract with the local authority.***

33.    Also on June 24th, *The New York Times* published a report entitled "Why Grenfell Tower Burned: Regulators Put Cost Before Safety."   In that report, *The Times* blamed the KCTMO for selecting the cheaper, combustible product – and specifically blamed Arconic's UK sales tactics for selling it to them.  That report stated in pertinent part as follows:

> Promising to cut "red tape," business-friendly politicians evidently judged that cost concerns outweighed the risks of allowing flammable materials to be used in facades.  Builders in Britain were allowed to wrap residential apartment towers – perhaps several hundred of them – from top to bottom in highly flammable materials, a practice forbidden in the United States and many European countries.  And companies did not hesitate to supply the British market.
>
> \*    \*    \*
>
> ***Arconic has marketed the flammable facades in Britain for years, even as it has adjusted its pitch elsewhere***.   In other European countries, Arconic's sales materials explicitly instructed that "as soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material."  ***An Arconic website for British customers said only that such use "depends on local building codes***."
>
> \*    \*    \*

[B]y 1998, regulators in the United States – where deaths from fires are historically more common than in Britain or Western Europe – began requiring real-world simulations to test any materials to be used in buildings taller than a firefighter's two-story ladder.  "The U.S. codes say you have to test your assembly exactly the way you install it in a building," said Robert Solomon, an engineer at the National Fire Protection Association, which is funded in part by insurance companies and drafts model codes followed in the United States and around the world.

*No aluminum cladding made with pure polyethylene – the type used at Grenfell Tower – has ever passed the test, experts in the United States say.  The aluminum sandwiching always failed in the heat of a fire, exposing the flammable filling.  And the air gap between the cladding and the insulation could act as a chimney, intensifying the fire and sucking flames up the side of a building.  Attempts to install nonflammable barriers at vertical and horizontal intervals were ineffective in practice*.

*As a result, American building codes have effectively banned flammable cladding in high-rises for nearly two decades*.

*      *      *

*In 2014, the Fire Protection Research Foundation, an organization in the United States, counted 20 major high-rise fires involving cladding*.  In at least a half-dozen – in France, Dubai, South Korea, the United States and elsewhere – the same type of panels installed at Grenfell Tower caught fire.  A 2014 fire in Melbourne, Australia, resulted in multiple investigations into the dangers of combustible cladding.  Another fire broke out in Dubai, around a 60-story skyscraper, on New Year's Eve of 2015, and yet another, around a 70-story skyscraper there, this April.

34.    *The Times* report further emphasized the extent to which Arconic had been improperly marketing its more flammable panels in the U.K, stating, in pertinent part, as follows:

In a brochure aimed at customers in other European countries, the company cautions that the polyethylene Reynobond should not be used in buildings taller than 10 meters, or about 33 feet, consistent with regulations in the United States and elsewhere.  "Fire is a key issue when it comes to buildings," the brochure explains.  "Especially when it comes to facades and roofs, the fire can spread extremely rapidly."

A diagram shows flames leaping up the side of a building.  "As soon as the building is higher than the firefighters' ladders, it has to be conceived with an incombustible material," a caption says.

*But the marketing materials on Arconic's British website are opaque on the issue*.

"*Q: When do I need Fire Retardant (FR) versus Polyethylene (PR) Reynobond? The answer to this, in part, depends on local building codes.  Please contact your Area Sales Manager for more information," reads a question-and-answer section*.

35.     In response to these news reports, the price of Arconic Preferred Shares declined precipitously when trading resumed on Monday June 26th, trading down as low as $36.24 in intraday trading, down nearly $4 per share, or 9.5%, from their close of $40.16 on the evening of Friday, June 23rd, on unusually high volume of more than 1.4 million shares trading.

36.     While the June 24th *Reuters* report had quoted Arconic, responding to questions about the 2014 emails, representing "in a statement that it had known the panels would be used at Grenfell Tower but that it was not its role to decide what was or was not compliant with local building regulations," later in the day in the U.S. on Monday June 26th, Arconic issued a public statement essentially conceding its prior misconduct.  In that announcement, Arconic stated that it was discontinuing the sale of its Reynobond PE core panels worldwide "for use in any high-rise applications regardless of local codes and requlations."  Arconic cited the purported inconsistency of building codes across the world and issues that had arisen in the wake of the Grenfell Tower tragedy regarding code compliance of cladding systems in the context of buildings' overall designs.  Arconic's statement also confirmed that its aluminum product, Reynobond PE, was part of the cladding system on the outside of Grenfell Tower.  As reported by *The Guardian* that day, "[t]he company emailed clients on Monday to tell them it would no longer sell Reynobond PE to buyers planning to use it on tower blocks."

37.     *The Guardian* also reported on Monday June 26th that the U.K. Department for Communities and Local Government had put in place a "combustibility testing programme" for aluminum composite materials and that in early testing, 60 samples from buildings in 25 areas

were classed as combustible, with approximately 540 then-still yet to be tested.  Over the prior

weekend, following the fire, hundreds of Londoners in public housing structures clad with ACM

panels had been forced to evacuate due to safety concerns.  *The New York Times* later reported

that "***[i]nvestigators had[d] found 75 buildings across Britain that ha[d] similar cladding, and***

***hundreds of apartments were evacuated on Friday [June 23rd] amid fears they faced similar***

***fire risks***."

38.     That same day, on June 26, 2017, *Bloomberg* reported that U.K. investigators

were targeting Arconic in their investigations as potentially liable, and that the investment

community was taking note, stating, in pertinent part, as follows:

> The use of combustible cladding has become a focal point for investigators.  As
> the U.K. looks to hold someone responsible, Arconic could be subject to
> significant liabilities, Seaport Global analyst Josh Sullivan said in an interview.

> "The political sentiment on the ground in the U.K. is very aggressive right now,"
> he said.  "Whether or not they are ultimately culpable, they are going to be a part
> of the inquiry process."

> While it's too early to determine the possible financial impact, the situation could
> make it more difficult for Arconic to find a permanent CEO, Cowen & Co.
> analyst Gautam Khanna said in a note.  David Hess has been serving on an
> interim basis since April, when Klaus Kleinfeld left the company.

39.     As reported by *The New York Times* on June 26th, Arconic's Reynobond PE "had

been assailed for their fire risks and faced tighter restrictions in the United States," the country of

the Company's origin, lamenting that "[s]uch regulatory gaps expose how multinational

corporations can take advantage of the vulnerabilities in government oversight."  *The Times* also

reported that "[t]he Metropolitan Police have also said they will consider manslaughter among

other charges," and that "in Britain, corporations can be charged with manslaughter."  *The Times*

report further emphasized that Arconic had been on notice of the fire-risk of these panels when

used improperly for years, stating, in pertinent part, as follows:

Even if the fire was started by the refrigerator, many fire safety experts point to the cladding, which was installed during a refurbishment finished last year, as a crucial factor in the rapid spread of the fire. ***Cladding has been blamed for numerous fires over the years, including several in Dubai, in the United Arab Emirates***.

40.     In response to these news reports, the price of Arconic Preferred Shares plunged further, trading down as low as $34.39 in intraday trading on June 27th, and closing down more than $3 per share, another approximately 9% decline from its close of $37.72 per share on June 26th, again on unusually high volume of 562,520 shares trading.

41.     As of the filing of this action, Arconic Preferred Shares are trading at below $40 per share, a more than 20% decline from the Preferred IPO price.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased Arconic Preferred Shares pursuant and/or traceable to the Registration Statement issued in connection with the Preferred IPO (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Arconic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

     (a)     whether Defendants violated the Securities Act;

     (b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

     (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §11 of the Securities Act
### Against All Defendants

48.     Plaintiff incorporates ¶¶1-47 by reference.

49.     This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

50.     The Registration Statement for the Preferred IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

51.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

52.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

53.     By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

54.     Plaintiff acquired Arconic Preferred Shares traceable to the Preferred IPO.

55.     Plaintiff and the Class have sustained damages.  The value of Arconic Preferred Shares have declined substantially subsequent to and due to Defendants' violations.

56.     At the time of their purchases of Arconic Preferred Shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

- 19 -

**COUNT II**

**For Violation of §15 of the Securities Act**
**Against the Company and the Individual Defendants**

57.    Plaintiff incorporates ¶¶1-56 by reference.

58.    This Cause of Action is brought pursuant to §15 of the Securities Act, 15 U.S.C.
§77o, against the Company and the Individual Defendants.

59.    The Individual Defendants each were control persons of Arconic by virtue of their
positions as directors and/or senior officers of Arconic.  The Individual Defendants each had a
series of direct and/or indirect business and/or personal relationships with other directors and/or
officers and/or major shareholders of Arconic.  The Company controlled the Individual
Defendants and all of Arconic's employees.

60.    The Individual Defendants each were culpable participants in the violations of
§11 of the Securities Act alleged in the Cause of Action above, based on their having signed or
authorized the signing of the Registration Statement and having otherwise participated in the
process which allowed the Preferred IPO to be successfully completed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead
Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of
Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class
members against all Defendants, jointly and severally, for all damages sustained as a result of
Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

   C.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees;

   D.  Awarding rescission or a rescissory measure of damages; and

   E.  Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY TRIAL DEMANDED**

  Plaintiff hereby demands a trial by jury.

DATED:  July 18, 2017     ROBBINS GELLER RUDMAN
             & DOWD LLP
          SAMUEL H. RUDMAN
          MARY K. BLASY


            */s/ Samuel H. Rudman*
           SAMUEL H. RUDMAN

         58 South Service Road, Suite 200
         Melville, NY  11747
         Telephone:  631/367-7100
         631/367-1173 (fax)
         srudman@rgrdlaw.com
         mblasy@rgrdlaw.com

         LAW OFFICES OF CURTIS V. TRINKO, LLP
         CURTIS V. TRINKO
         16 West 46th Street, 7th Floor
         New York, NY  10036
         Telephone:  212/490-9550
         212/986-0158 (fax)
         ctrinko@trinko.com

         *Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, JANET L. SULLIVAN ("Plaintiff") declare, as to the claims asserted under the federal securities laws that:

1. Plaintiff has reviewed the complaint and has authorized its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel, or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4. Plaintiff's purchase and sale transactions in the Arconic Inc. (formerly Alcoa Inc.) securities that are the subject of this action during the Class Period is, as follows:

## TRANSACTIONS IN ARCONIC INC. / ALCOA INC.

**A. PURCHASES**

| Securities | Buy / Reinvestment Date | Shares | Price Per Share |
|---|---|---|---|
| a) Preferred Convertible Class B Series 1 | 12/08/14 | 500 | $51.9553 |
| b) Preferred Convertible Class B Series 1 | 01/04/16 | 9.8516 | $34.10 |
| c) Preferred Convertible Class B Series 1 | 04/01/16 | 10.5892 | $32.3499 |
| d) Preferred Convertible Class B Series 1 | 07/01/16 | 10.6867 | $32.7201 |
| e) Preferred Convertible Class B Series 1 | 10/03/16 | 11.2323 | $31.7699 |
| f) Preferred Convertible Class B Series 1 | 01/03/17 | 11.36256 | $32.0701 |
| g) Preferred Convertible Class B Series 1 | 04/03/17 | 9.0058 | $41.31 |

**B.** Plaintiff currently owns 562.7282 shares of Arconic Inc. Preferred Convertible Class B Series 1 stock.

**C.** Plaintiff had no sales of Arconic Inc. Preferred Convertible Class B Series 1 stock.

5. Plaintiff has complete authority to bring a suit to recover for investment losses on

behalf of purchasers of the subject securities described herein.

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws.

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___11___ day of ___July___, 2017.

_____
Signature

Janet Sullivan
Print Name